# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  August 18, 2017

Mr. Michael R. Dezsi
615 Griswold Street, Suite 1600
Detroit, MI 48226

Mr. Davidde A. Stella
Mr. James M. Surowiec
Department of Corporation Counsel
for the County of Wayne
500 Griswold Street, 30th Floor
Detroit, MI 48226

Re: Case No. 16-2102, *Amanda Sumpter v. Wayne County, et al*
Originating Case No. : 5:14-cv-14769

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0187p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

AMANDA SUMPTER,

                         *Plaintiff-Appellant,*

      *v.*

WAYNE COUNTY, et al.,

                     *Defendants-Appellees.*

No. 16-2102

---

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:14-cv-14769—John Corbett O'Meara, District Judge.

Argued: March 9, 2017

Decided and Filed: August 18, 2017

Before: CLAY, SUTTON, and GRIFFIN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Detroit, Michigan, for Appellant. Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees. **ON BRIEF:** Michael R. Dezsi, LAW OFFICE OF MICHAEL R. DEZSI, PLLC, Detroit, Michigan, for Appellant. Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellees.

      GRIFFIN, J., delivered the opinion of the court in which SUTTON, J., joined. CLAY, J. (pp. 21–37), delivered a separate dissenting opinion.

---

**OPINION**

---

GRIFFIN, Circuit Judge.  Pretrial detainees must tolerate some invasion of their privacy in order to accommodate the important government interests necessary for the operation of the detention facility.  For instance, detainees may be subjected to suspicionless strip searches as part of the jail's intake process.  *See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012).  The issue we face is whether periodically conducting group strip searches when the number of jail inmates waiting to be processed makes individual searches imprudent constitutes a violation of clearly established Fourth Amendment law.  Under the facts of this case, we answer that question "no" and therefore hold that the jail official who conducted the group searches, defendant Terri Graham, is entitled to qualified immunity.  In addition, we affirm the district court's grant of summary judgment in favor of defendants Wayne County and the Wayne County Sheriff on plaintiff's *Monell* claims and requests for injunctive and declaratory relief.

I.

In late 2012, plaintiff Amanda Sumpter spent a month in the Wayne County Jail in Detroit, Michigan.[1]  During her incarceration, Sumpter underwent four strip searches that she alleges violated her Fourth Amendment rights.

Three of the searches occurred in the jail's Registry, where inmates are routinely strip searched when first arriving to jail or returning from a trip outside.  Defendant Corporal Terri Graham conducted the three Registry searches of plaintiff.  No male deputies were present for these searches.  Each time, Graham escorted plaintiff into the Registry with as many as five other women.  Although the door to the room had a window, it was covered with paper, preventing anyone outside the Registry from observing the searches.  Inside, Graham instructed the inmates

---

[1] Following her arrest for multiple felonies arising out of a motor vehicle accident, Sumpter was incarcerated in the Wayne County Jail from October 10 to November 13, 2012, at which time she was transferred to the Michigan Department of Corrections to serve a prison term of one-to-five years.  On October 29, 2012, she entered a plea of nolo contendere and was sentenced on November 12, 2012.

to undress, and if they were arriving for the first time, she collected their street clothes and personal effects. She then directed the inmates to perform a series of tasks, including shaking their hair, opening their mouths, lifting their breasts, and squatting and coughing, while Graham visually inspected for hidden contraband—an experience plaintiff described as "embarrassing" and "humiliating." Afterwards, Graham provided the inmates with jail attire, and escorted the arriving inmates to see medical personnel while the returning inmates waited to be taken to their cellblock.

The fourth search occurred in plaintiff's cellblock, where inmates are housed. After searching the cells for contraband, an unidentified female guard gathered the inmates in the common area, lined them up, and conducted a group strip search. According to plaintiff, the strip search took place in view of the guards' central command post inside the cellblock, commonly called the "Bubble." During this search, plaintiff saw and heard three male guards inside the Bubble. Although she could not identify their faces because the glass was tinted, she saw their silhouettes and believed they were facing the common area.

Two years later, in December 2014, plaintiff filed suit against Graham, Wayne County, and the Wayne County Sheriff, alleging that the searches violated her constitutional rights. Plaintiff's complaint alleged two Fourth Amendment claims: first, she complained that Graham's three Registry searches were unreasonable because they were conducted in an unprofessional manner and in front of other inmates; second, she alleged that the group strip search in her cellblock was unreasonable because male guards were able to watch from the Bubble. Plaintiff sought monetary, injunctive, and declaratory relief on behalf of herself and all other similarly situated female inmates at the Wayne County Jail.

Plaintiff also filed motions to certify the class and to preliminarily enjoin the group searches. Before the district court ruled on these motions, defendants filed a motion for partial summary judgment. First, Graham argued that she was entitled to qualified immunity on the Registry-searches claim. Relying on Graham's affidavit and deposition testimony that she conducted group strip searches only when the volume of inmates waiting to be processed required it, defendant Graham argued that no case clearly established that her conduct constituted a Fourth Amendment violation. Second, defendants Wayne County and the Wayne County

Sheriff moved for summary judgment on plaintiff's cellblock-search claim on the grounds that plaintiff merely alleged an isolated incident without submitting any evidence showing it was the product of an official policy or custom. Finally, defendants argued that plaintiff's requests for injunctive and declaratory relief were moot because Sumpter did not reside at the jail at the time she sued.

The district court agreed with defendants on all three fronts. In the same order, it also denied without prejudice the pending motion for class certification, as well as plaintiff's motion to strike an errata sheet that defendants filed as part of their summary judgment motion.[2] Following the entry of a final judgment, plaintiff appeals.

## II.

We review a district court's grant of summary judgment de novo. *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact," which is to say, "[t]here must be evidence on which the jury could reasonably find for the [nonmovant]." *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (citation and internal quotation marks omitted). "We consider all facts and inferences drawn therefrom in the light most favorable to the nonmovant." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

## III.

### A.

The district court granted summary judgment in favor of Graham on the basis of qualified immunity. That doctrine shields governmental officials from monetary damages as long as "their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

---

[2]Plaintiff challenges these two rulings on appeal, but her arguments are contingent on success with respect to at least one of her substantive claims. In light of our decision to affirm the summary judgment in defendant's favor, we need not address these claims.

To determine whether a defendant is entitled to qualified immunity, we perform a two-part inquiry, *Pearson v. Callahan*, 555 U.S. 223, 232 (2009), which we may conduct in either order, *id.* at 236. We ask whether the facts alleged or shown "make out a violation of a constitutional right" and "whether the right at issue was 'clearly established'" at the time of the incident. *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A plaintiff must satisfy both inquiries in order to defeat the assertion of qualified immunity. *Wesley v. Campbell*, 779 F.3d 421, 428–29 (6th Cir. 2015).

### B.

The Fourth Amendment governs plaintiff's claim against Graham. As in most Fourth Amendment contexts, the legal standard in this case requires us to balance the nature of the intrusion against the need for the particular search, though in the corrections setting we afford deference in favor of correctional officials' penological expertise and interests. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012) ("[C]ourts should ordinarily defer to their expert judgment in such matters." (citation omitted)).

This deferential balancing test originates from *Bell v. Wolfish*, 441 U.S. 520 (1979), where the Court confronted for the first time the issue of strip searches in the corrections context. In *Bell*, the Court held that a federal detention center's blanket policy of conducting visual body cavity inspections of all detainees returning from a "contact visit" did not violate the Fourth Amendment. *Id*. at 558, 560. Along with its holding, the Court set forth "general principles" to guide the analysis of searches conducted in the corrections setting. *Id.* at 545.

The Court began by recognizing that pretrial detainees "do not forfeit all constitutional protections" as a result of their confinement, *id.*, but their rights are necessarily limited by "the legitimate goals and policies of the penal institution," *id.* at 546. Among the legitimate goals of a penal institution is "maintaining institutional security and preserving internal order and discipline," matters that the Court emphasized were within the expertise of corrections officials. *Id.* "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," *id.* at 547, the Court said, acknowledging that a given corrections official will naturally "have a better grasp of his domain than the reviewing judge," *id.* at 548.

Consequently, corrections officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547. That is, unless there is "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations[.]" *Id.* at 548.

The Supreme Court returned to these principles thirty years later when it revisited the issue of jail strip searches in *Florence*. There, the Court confronted whether the Fourth Amendment required jail officials to have reasonable suspicion before strip searching new detainees who were arrested for minor offenses and being committed to the jail's general population. *Florence*, 566 U.S. at 330, 338–39; *id.* at 340 (Alito, J. concurring) ("The Court holds that jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches[.]").

"In addressing this type of constitutional claim," the Court said, harkening back to *Bell*, "courts must defer to the judgment of correctional officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Id.* at 322–23. In response to plaintiff's proposal to require reasonable suspicion before searching new detainees, the *Florence* Court held that "[i]t [was] reasonable . . . for correctional officials to conclude this standard would be unworkable." *Id.* at 334. Echoing the jail administrator's contentions, the Court observed that the offense of arrest is not a reliable indicator of dangerousness; and even if it was, there is often insufficient information about each new detainee's criminal history in order to make that assessment; and if there was, officers would "encounter serious implementation difficulties" trying to make those difficult, fact-intensive assessments under "the pressures of the intake process." *Id.* at 334–37. In light of these considerations, the Court held that the jail's blanket search policy "struck a reasonable balance between inmate privacy and the needs of the institutions." *Id.* at 339.

Since *Florence*, our court has decided several cases involving strip searches. Two of these decisions are argued at length in this appeal.

The first is *Stoudemire v. Michigan Department of Corrections*, 705 F.3d 560 (6th Cir. 2013). In that case, a prison guard subjected the plaintiff to an impromptu strip search while she was standing in a common area of the prison. *Id.* at 566. When the plaintiff asked why she was being searched, the defendant responded, "[b]ecause I can." *Id.* at 566–67. The defendant then escorted the plaintiff to her cell, which was adjacent to a busy hallway. *Id.* at 567. Inside, with the window to the hallway open, the defendant conducted a strip search with a smirk on her face. *Id.* During the search, the plaintiff could hear people in the hallway and realized that they could see her. *Id.* This court found the alleged search to be unreasonable. "[A] strip search is a particularly extreme invasion," we said, and "[t]he location of the strip search made it more invasive," as did the manner in which the defendant conducted it. *Id.* at 573. As for any legitimate penological justification for conducting the search, we concluded that "no special circumstances" such as an "emergency" or "time or resource constraints" justified "strip searching Stoudemire where others could see her naked." *Id.* at 574. "[T]aking the facts as Stoudemire alleged them," and balancing the significant intrusion against the non-existent penological justifications, we held that "[the plaintiff] has established a constitutional violation." *Id.*

The second case is *Williams v. City of Cleveland*, 771 F.3d 945 (6th Cir. 2014). The issue in *Williams* was "whether a complaint states a constitutional claim when it alleges that defendant's jail, instead of using less invasive procedures, compelled pretrial detainees who were being processed into the facility to undress in the presence of other detainees and to have their naked genitals sprayed with delousing solution from a pressurized metal canister." *Id.* at 947. Applying *Bell*'s balancing test, we held such allegations stated a plausible Fourth Amendment claim. *Id.* at 952–55. Starting from the premise that visual strip searches conducted in private are themselves "an offense to the dignity of the individual," we concluded that intentionally touching a naked detainee (as the defendants did with the delousing agent) and doing so in the presence of other detainees only exacerbates the humiliation and injury to personal privacy that naturally attends strip searches. *Id.* at 952 (quoting *Stoudemire*, 705 F.3d at 572–73). In weighing the "significant incursion into plaintiffs' privacy rights" against the facility's need to conduct the searches, we cautioned, "[a]t this juncture in the analysis, the procedural posture of this case is important." *Id.* at 954. Because the case came to this court at the motion-to-dismiss

stage, "plaintiffs were required only to plausibly allege—rather than demonstrate—that the jail acted unreasonably." *Id.* We held that the plaintiffs' proposed complaint—which alleged that jail administrators could have allowed detainees to self-apply the delousing agent privately—accomplished that. *Id.* Because the plaintiffs alleged the availability of "easily implemented and significantly less-invasive alternative[s]" to the significantly intrusive searches that were actually conducted, we held that plaintiffs plausibly alleged a Fourth Amendment claim. *Id.* at 955–56.

C.

The constitutionality of the searches at issue in this case involves a three-step analysis. First, we determine the nature of intrusion, "examin[ing] the scope, manner, and location of the search." *Stoudemire*, 705 F.3d at 572. Second, we "evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions." *Id.* And third, "we determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

*Nature of the Intrusion*. "[A] strip search, by its very nature, constitutes an extreme intrusion upon personal privacy." *Id.* (quoting *Wood v. Clemons*, 89 F.3d 922, 928 (1st Cir. 1996)); *see also Williams*, 771 F.3d at 952. The act of a stranger examining the most private areas of one's body "is 'an offense to the dignity of the individual' that is 'undoubtedly humiliating and deeply offensive to many[.]'" *Williams*, 771 F.3d at 952 (quoting *Stoudemire*, 705 F.3d at 572–73). Intrusive under ideal circumstances, strip searches are especially humiliating when they are conducted in front of other inmates: "The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed." *Id.* at 953. The same applies to strip searches conducted in a discourteous manner. *See Stoudemire*, 705 F.3d at 573.

These basic principles teach us that the Registry searches plaintiff endured constituted a significant intrusion into her bodily privacy. Graham's visual inspections of plaintiff's naked body, though only skin-deep, constituted a profound intrusion into her personal privacy, an intrusion only magnified by the fact that plaintiff was exposed to several other inmates during

each search.  Moreover, plaintiff testified that, while she did not believe Graham intended to humiliate or harass her, Graham made several rude comments about her body odor and hygiene, saying she "[s]mells like a funky monkey" and telling her she needed to clean herself better. These comments, while not dispositive of reasonableness, "implicate the dignitary interest 'inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches.'"  *Id.* (quoting *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 499 (6th Cir. 2008)).  Taken together, the scope, manner, and location of the searches overwhelmingly support the conclusion that the searches plaintiff endured were especially intrusive.[3]

Nevertheless, the nature of the intrusion is only part one of the inquiry.  An intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate's interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system.  *Florence*, 566 U.S. at 326–28.  In every case, corrections officials and reviewing courts must balance the intrusion against "the need for the particular search at issue" to determine whether the search is constitutionally tolerable.  *Stoudemire*, 705 F.3d at 573 (internal quotation marks and emphasis omitted).  We proceed, then, to the second step of the analysis to determine whether defendants have asserted a legitimate penological justification for conducting the group searches.

*Penological Justification.*  The sort of group searches plaintiff endured were not the norm in the Registry.  According to jail policy applicable during plaintiff's detention, guards were to conduct strip searches "out of view of the public and other inmates" "[w]hen possible."[4]  And according to Graham, she followed that policy.  "Group searches were the exception," she said at her deposition, "not the rule."  Thus, the relevant question is whether Graham had a legitimate

---

[3]Our conclusion is based solely on the evidence pertaining to the three searches of plaintiff.  Although plaintiff presents evidence that other inmates endured similar group searches, that evidence is irrelevant to whether the specific searches of plaintiff were unreasonable.  *See Warshak v. United States*, 532 F.3d 521, 528 (6th Cir. 2008) (en banc) (stating that questions of Fourth Amendment "reasonableness" involve "case-by-case determinations"); *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (stating that the test of qualified immunity is whether the "official's acts violated *the plaintiff's* clearly established constitutional right" (emphasis added) (citation omitted)).

[4]Approximately one year after plaintiff left the Wayne County Jail, the facility changed its policy to allow only individual strip searches; a change defendants insist was taken as a "precautionary measure," and "not because the Sheriff's Office believed that the policy or method of searching was improper."  We confine our qualified immunity analysis to the time of the contested searches.

penological justification for deviating from the general rule. *See id.* ("We must further determine 'the need for the *particular* search' at issue." (quoting *Bell*, 441 U.S. at 559)). She did.

Graham testified that she conducted group strip searches of up to five inmates when the high volume of inmates demanded it. She explained that when there is a line of twenty or more women waiting to be processed, conducting one-on-one searches for every inmate "takes a long time," which in turn causes a ripple effect on the rest of the registration process. For example, when the bottleneck peaks during the afternoon shift, "sometimes [inmates] get left over to midnight shift," causing additional delays for inmates waiting to see the psychologist who only works the day shift. Conducting individual searches in those circumstances not only impeded the facility's interest in expeditiously processing incoming inmates, it compromised the health and safety of those inmates caught up in the delay. Again, Graham explained: "I conducted the strip searches as quickly and efficiently as possible," not only to find contraband, but "to route inmates needing medical care, psychiatric care, or special housing as quickly as possible, because a large number of the female inmates coming into the Jail have mental health issues or need medical care."

Jeriel Heard, the Chief of Jails and the corrections official who later changed the strip search policy, *see supra* n.4, recognized the legitimacy of Graham's justification:

> I understood, also, that there is such pressure on the deputies to get these—
> particularly the women inmates—processed because so many of them are flagged
> for seeing a medical professional or mental health professional . . . that the
> officers may have . . . tried to accelerate the way they could get these inmates . . .
> up to the second floor where the doctors and the nurses are.

Heard continued, emphasizing the health-and-safety implications of a delay in the Registry: "[I]t's a real challenge to make sure that we get these inmates processed as quickly as possible . . . some of wh[om], by the way, may have been in lockup . . . two or three days without psychotropic medication, and they are really acting up."

Plaintiff gives us no reason to doubt the legitimacy of defendants' asserted justification. In this court, she claims in conclusory fashion that there was no legitimate penological need for the group searches, but she fails to address the justification put forward by defendants. And in response to defendants' motion for summary judgment below, plaintiff presented no evidence to

dispute their asserted penological justification, much less "substantial evidence" that Wayne County "exaggerated their response to these considerations." *Bell*, 441 U.S. at 548. In addition, the passage of time appears to have validated Graham. Since moving away from periodic group searches, the jail has seen an increase in delays in the intake process. According to Graham, "[T]he incidence of inmate booking 'spilling over' into the next shift has increased," which in turn has caused an uptick in "incidents of unsearched inmates passing and attempting to pass contraband to searched inmates[] who are waiting to be processed into the jail." Graham has also noticed that "the time it takes to get female inmates to medical [personnel] to treat conditions like heroin addiction; seizures; colostomy care; assistive devices (canes, crutches, etc.); mental health treatment; and housing has substantially increased, sometimes by hours."

For these reasons, and following the Supreme Court's repeated admonitions in *Bell* and *Florence*, we accord considerable deference to defendants' assertion that they conducted group strip searches when the high volume of inmates and concomitant effect of delays on inmate health and safety demanded it. *See Florence*, 566 U.S. at 326 ("[C]orrectional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face."); *Bell*, 441 U.S. at 548 ("[C]ourts should ordinarily defer to their expert judgment in such matters.").

To summarize, on one hand, the group strip searches plaintiff endured in the Registry were especially intrusive; on the other hand, defendants have asserted a legitimate penological justification for periodically conducting the searches. Typically, we would proceed to balance the nature of the intrusion against the penological justification to determine whether the searches were unreasonable under the Fourth Amendment. However, we need not go that far in order to determine that Graham is entitled to qualified immunity.

Qualified immunity protects a constitutional tortfeasor from personal liability unless the contours of the constitutional right she violated "were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). The dispositive inquiry, "undertaken in light of the specific context of the case, [and] not as a broad general proposition," is "whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308

(2015) (per curiam) (first quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) and then *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

Nowhere is that specificity as important as in the Fourth Amendment context, where, under the governing ad-hoc interest-balancing test, "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id*. at 308 (quoting *Saucier*, 533 U.S. at 205). Because "case-by-case, incremental decisionmaking of balancing tests . . . infrequently will provide the 'fair notice' that qualified-immunity precedent requires," *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 234–35 (6th Cir. 2005), "[c]ourts generally accord public officials wide latitude (for qualified-immunity purposes) when the constitutionality of their acts comes down to the subtleties of interest balancing[.]" *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 443 (6th Cir. 2016). Thus, it is imperative that plaintiff rely on a decision that "squarely governs" the outcome of the case. *See Brosseau*, 543 U.S. at 201. That she cannot do.

Plaintiff claims that *Stoudemire* and *Williams* clearly establish the right at issue, but these decisions come up short for several reasons. First, *Stoudemire* and *Williams* were decided *after* the events in this case. Thus, the decisions themselves could not have put Graham on notice that her conduct was unconstitutional. *Id.* at 200 n.4. Plaintiff responds that *Stoudemire* held that the right at issue in that case was clearly established as early as 2007, several years *before* the events of this case.[5] *See Stoudemire*, 705 F.3d at 575 (holding that "the state of the law in existence at the time of the strip search . . . was clearly established"). At best, then, plaintiff's argument is one by analogy. But even this argument fails because both *Stoudemire* and *Williams* are distinguishable in one important respect: in both cases, there was *no* penological justification for the particular searches at issue. This critical difference makes *Stoudemire* and *Williams* poor templates for declaring the particularized right at issue in this case—freedom from a group strip search *supported* by a legitimate penological justification—clearly established. *See Brosseau*,

---

[5]We note that this response does not save plaintiff's argument as it pertains to *Williams*, since *Williams* did not involve qualified immunity and thus had no occasion to declare that the right at issue was clearly established by 2012. *See generally*, *Williams*, 771 F.3d 945. But even if that were not the case, there is a more fundamental problem with plaintiff's reliance on *Williams*, as explained in the text.

543 U.S. at 201 (holding that factually distinguishable circuit precedent "by no means 'clearly establish' that [the defendant]'s conduct violated the Fourth Amendment").

First consider *Williams*. The procedural posture of the case required this court to accept as true the plaintiff's plausible allegation that the defendants had no legitimate justification for conducting group strip searches. *Williams*, 771 F.3d at 949, 956. Thus, we had no occasion to evaluate any proposed penological justification, let alone weigh it against the nature of the intrusion. Indeed, *Williams* itself recognized that its holding did not extend to cases like the one before us: "[O]f course, the jail may have had good reasons for conducting these procedures in the particular manner in which it did[,] [b]ut that is a matter for resolution . . . on summary judgment[.]" *Id.* at 955 (citation omitted); *see also id.* ("Whether the particular manner in which the jail conducted the searches . . . was 'justified' depends on the facts[.]").

Unlike *Williams*, the present case comes to us at the summary judgment stage, and Wayne County and Graham have provided a legitimate penological justification for the periodic group strip searches; a justification that Sumpter has not disputed. As a result, we are obligated to consider their evidence. *Compare id.* at 956 ("[T]he district court cannot have opined that the jail's conduct was 'justified' without examining the evidence—which, of course, it cannot do when determining merely whether the proposed complaint failed to state a claim."), *with Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." (internal quotations omitted)).

Next consider *Stoudemire*. The plaintiff in that case presented evidence that there was no exigency or "time or resource constraints" to justify conducting the search where others could see the plaintiff naked, which led this court to hold that the search was "devoid of any legitimate penological justification." *Stoudemire*, 705 F.3d at 574–75. In the absence of a governmental interest, the outcome of the balancing test was obvious, so obvious that any reasonable officer in the defendant's position would have known that the search was unreasonable. *Id.* at 575; *see also Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (holding that violation of a

"'clearly established' constitutional right" occurs "where the violation was sufficiently 'obvious' under the general standards of constitutional care").

In stark contrast to *Stoudemire*, however, Graham testified without contradiction that she conducted group searches when time and resource constraints required it. *Cf. Stoudemire*, 705 F.3d at 574. Thus, the clearly established right recognized in *Stoudemire*—a public strip search "devoid" of justification—could not have put a reasonable officer on notice that what Graham did—a group strip search *supported* by a legitimate penological justification—was unconstitutional.

Plaintiff reads *Stoudemire* differently. According to Sumpter, *Stoudemire* "identified a well[-]established right, the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest"—a right established long before the events in this case. *Id.* at 575 (emphasis omitted) (quoting *Farmer v. Perrill*, 288 F.3d 1254, 1260 (10th Cir. 2002)). But saying "strip searches must be supported by a legitimate justification" is just another way of saying "searches must be reasonable." As the Supreme Court has emphasized on multiple occasions, "that is not enough." *Saucier*, 533 U.S. at 202; *see also al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). We do not read *Stoudemire* as ignoring this command. Rather, *Stoudemire* held that the particularized right at issue in that case—freedom from an especially intrusive public strip search "devoid" of justification—was clearly established because the outcome of the Fourth Amendment balancing test between weighty privacy interests on one hand and no governmental interest on the other was obvious. *See* 705 F.3d at 575 ("[A] reasonable officer would have been on notice that the search was unreasonable *under the circumstances* and devoid of any legitimate penological justification related to security and order." (emphasis added)). As discussed above, its holding sheds no light on whether Graham's actions, undertaken in wholly different circumstances, were unconstitutional.

5:14-cv-14569-JCO-RSW Doc # 64-1 Filed 08/18/17 Pg 16 of 39 Pg ID 1743    (16 of 39)

These differences matter because the existence of a countervailing government interest necessarily affects the third step in the constitutional analysis, the balancing calculus. And this is critical for purposes of qualified immunity analysis. Regardless of how the balancing actually plays out, one thing is clear: *Stoudemire* and *Williams* could not have predicted the result since neither case involved penological justifications to weigh against the nature of the intrusion. To put it in more descriptive terms: it is easy enough to predict how scales with one hundred apples on one end will balance out, but it is far more difficult to predict how many oranges must be added to the other side to bring it to equipoise. Tasked with making that second prediction, *Graham* would have found no clues in "apples-only" cases like *Stoudemire* and *Williams*.

The dissent starts with the wrong question. It asks whether our case law clearly establishes Officer Graham's justification for the group searches as a legitimate one. *Infra* at 11–12. But that's not how qualified immunity works. To overcome an officer's request for immunity, the plaintiff must show that the "right" she seeks to vindicate is clearly established, not that the officer's justification is *not* clearly established. *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). The issue is the right to be free from a group strip search where the officer has an administrative need to process a large quantity of inmates at one time. The cases fail to address this situation, and so the right is not (and was not) clearly established. In focusing on only one half of the right at issue, the dissent inverts the burden, leaving the officer, rather than the plaintiff, in need of clearly established law to succeed. The dissent also focuses much of its energy on a question we do not address: whether the searches violate the Fourth Amendment. Its key points—that the jail later changed (or clarified) its policy, that Officer Graham had other alternatives available to her, and that she could have anticipated the situation and planned accordingly—all fail to address whether the *law* at the time clearly established the searches as Fourth Amendment violations.

The absence of a decision that "squarely governs" this situation is particularly detrimental to plaintiff's claim because, when the constitutional test is one of interest-balancing, the point at which the constitutional shades into the unconstitutional will necessarily be gray. *Brosseau*, 543 U.S. at 201. Qualified immunity exists to give public officials breathing room to make close calls when the issue is not black-and-white. *al-Kidd*, 563 U.S. at 743. And this breathing room

is especially appropriate when the legal standard is flexible and heavily dependent on on-the-ground judgment calls, as it is in this context. *See Florence*, 566 U.S. at 326 ("[C]orrectional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face."); *Bell*, 441 U.S. at 559 ("The test of reasonableness . . . is not capable of precise definition or mechanical application."); *see also Hernandez v. O'Malley*, 98 F.3d 293, 297 (7th Cir. 1996) ("Contextual balancing tests should be worked out prospectively, rather than at the expense of public officials who guess wrong about future legal developments."). Strip searches, even when conducted in the most private circumstances, are intrusive. But in the absence of bright lines and per se prohibitions, whether and when to subject inmates to increasingly intrusive searches depends on the facts confronting the corrections official in each particular case.

For these reasons, we need not conduct the Fourth Amendment analysis to its completion in order to conclude that Graham is entitled to qualified immunity. Neither *Stoudemire*, nor *Williams*, nor any other case, would have put Graham on notice that conducting group strip searches when the volume of inmates made individual searches imprudent was unreasonable. Thus, regardless of whether Graham, in fact, violated the Fourth Amendment, no reasonable officer would have known that at the time. We therefore hold, as the district court did, that defendant Graham is entitled to qualified immunity.

IV.

The district court also granted summary judgment in favor of Wayne County and the Wayne County Sheriff in his official capacity on plaintiff's Fourth Amendment claim regarding the cellblock search.[6] Accepting plaintiff's testimony that three male guards may have observed the cellblock search, the district court ruled that "municipal liability cannot be imposed upon the defendant county based upon a single incident of an alleged tortfeasor's conduct."

Plaintiff argues that the district court mistakenly held that her cellblock search was a "single incident." She contends that the record contains hundreds of affidavits from former

---

[6]The dissent would also allow Sumpter's "individual" claim regarding the cellblock search in the presence of male officers to proceed. *Infra* at 16. The main problem is that Sumpter has no such claim. Sumpter sued only one officer individually: Officer Graham. And while Sumpter alleges that Graham participated in the intake searches, she does not allege that Graham participated in the cellblock search. As to that search, Sumpter sued only the County and the County's sheriff (in his official capacity).

inmates recounting similar incidents, evidence she contends demonstrates that Wayne County had a policy of permitting this unconstitutional conduct. Only by turning a "blind eye toward this record evidence," plaintiff argues, could the district court hold that hers was an isolated incident.

The problem with plaintiff's argument is reflected in her choice of idiom. To "turn a blind eye" presupposes someone has been given information that he prefers to ignore. *See blind*, *Oxford Dictionary of English Idioms* (3d ed. 2009) (explaining that the phrase is a reference to Admiral Horatio Nelson, who, after receiving word that his superior officer was signaling him to stand down at the Battle of Copenhagen, lifted his telescope to his blind eye, "thereby ensuring that he failed to see his superior's signal to discontinue the action"). That did not happen in this case.

The record shows that plaintiff failed to marshal the collection of affidavits in an effort to establish that the cellblock search was not an isolated incident. Plaintiff insists she did so by dropping a footnote in response to defendant's motion and stating that she "relies on, and incorporates herein, the affidavits . . . in opposition to summary judgment." But this is the summary judgment equivalent of "hid[ing] elephants in mouseholes." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The context of this offhand reference—during a separate argument that Graham's Registry searches were unreasonable—shows that she did not employ the affidavits in support of her cellblock search claim. In fact, Sumpter did not mention this *Monell* claim at all in her response to summary judgment. Her brief refers only to the group strip search *Monell* claims, not the cellblock searches in front of male officers, and even then only in a single offhand remark.[7] In short, because plaintiff failed to bring the affidavits to the district court's attention in connection with the cellblock claim, it had no occasion to consider them in that context. *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007)

---

[7]Plaintiff apparently thought defendants were not seeking summary judgment on this claim. At the outset of her response, she stated, "Defendants are not seeking summary judgment as to Plaintiff's claims that her strip search, in the presence of members of the opposite sex, was a violation of her Fourth Amendment rights." She was mistaken. The final section of defendants' motion for summary judgment, entitled "Plaintiff Cannot Establish a Municipal Liability Claim Under § 1983," argued, "[E]ven assuming that Plaintiff was searched in the manner alleged in her deposition testimony, this *single instance* of male deputies being in the duty station during the search is insufficient to establish that Wayne County had an unconstitutional policy of forcibly exposing female inmates in a state of undress to male guards."

("[T]he opposing party 'has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.'" (quoting *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).  Nor will we fault the district court for failing to do so.  We have said time and again, district courts cannot be expected to dig through the record to find the seeds of a party's cause of action.  *See, e.g.*, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).  Plaintiff must mark each site, identifying the genuine disputes of fact that preclude summary judgment on a particular claim.  *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 847 (6th Cir. 2016).  The district court had no obligation to do plaintiff's work for her, nor do we.  We therefore affirm the decision granting summary judgment in favor of defendants on the cellblock search claim.[8]

## V.

This leaves plaintiff's claims for injunctive and declaratory relief.  The district court held that these claims were moot because plaintiff was no longer housed at the Wayne County Jail and the Wayne County Jail formally changed its policy to prohibit group strip searches.  We affirm the decision to grant summary judgment on these claims, though we conclude that the doctrine of standing, as opposed to mootness, is the correct rationale.

The doctrines of standing and mootness are similar, but they are not the same.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).  Standing seeks to ensure the plaintiff has a "personal stake in the outcome of the controversy" at the outset of litigation.  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  Mootness, on the other hand, "is akin to saying that, although an actual case or controversy once existed, changed circumstances have intervened to destroy standing."  *In re: 2016 Primary Election*, 836 F.3d 584, 588 (6th Cir. 2016).  The common refrain that mootness is just "standing set in a time frame" best captures the temporal distinction: standing applies at the sound of the starting gun, and mootness picks up the baton from there.

---

[8]We also note that, because Sumpter has not shown that the group Registry searches violated clearly established law, Wayne County cannot be liable for failing to train its officers to avoid them.  Municipalities are liable for a failure to train when the failure amounts to a deliberate indifference to the rights of persons with whom its officers come into contact.  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  But a municipality cannot be deliberately indifferent for failing to train officers to avoid constitutional violations that have not been clearly established as such.  *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012); *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 995 (6th Cir. 2017).

*See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). That temporal distinction is relevant, at least in relation to the district court's decision, because plaintiff's claims for injunctive and declaratory relief did not present an actual case or controversy at the time she filed her complaint. Hence, it is more accurate to say she lacked standing to bring these claims, rather than say they are moot.

To satisfy Article III standing, plaintiff must show, among other things, that she "suffered an 'injury in fact,'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted), and she must do so for each form of relief, *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross."). In the context of claims for injunctive or declaratory relief, "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized," and that "threat must be actual and imminent, not conjectural or hypothetical[.]" *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "[P]ast exposure to illegal conduct . . . unaccompanied by any continuing, present adverse effects," will not suffice to establish "a present case or controversy." *Lyons*, 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Yet, "past exposure to illegal conduct" is precisely what plaintiff alleges here.

Sumpter claims she was subjected to four separate strip searches as an inmate in the Wayne County Jail between October and November 2012. However, she left the jail in November 2012, and we can only speculate as to whether she will ever return. At this juncture, we must assume that plaintiff "will conduct [her] activities within the law and so avoid . . . exposure to the challenged course of conduct." *O'Shea*, 414 U.S. at 497. The likelihood of future injury is further diminished by the fact that defendants have changed their official policy to prohibit group strip searches. In the absence of evidence demonstrating a "sufficiently real and immediate" threat of being subjected to group strip searches at the Wayne County Jail again, *id*. at 496, plaintiff has failed to establish standing to seek injunctive or declaratory relief, *see Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) ("[P]ast injury [with] no continuing, present adverse effects . . . cannot establish standing for declaratory and injunctive relief.").

The foregoing renders plaintiff's challenges to the district court's decision moot. She argues that the district court's reasoning overlooks cases like *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *Sosna v. Iowa*, 419 U.S. 393 (1975), which she claims recognize a special rule in putative class action cases where the named plaintiff's claim is mooted before the class can be certified. But those cases are no help to plaintiff because the complaining parties had a live, actionable claim for injunctive relief at the time they filed suit—which is to say, they had standing. *See Gerstein*, 420 U.S. at 110 n.11; *Sosna*, 419 U.S. at 402. Plaintiff also insists that her suit fits the exception for cases that are "capable of repetition, yet evading review." But that exception cannot cure lack of standing, *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190–91 (2000), and even in the mootness context, it only applies when "there is a reasonable expectation that *the same complaining party* will be subject to the same action again," *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (bracketing omitted) (emphasis added) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990)). Again, there is no indication that plaintiff intends to return to the Wayne County Jail anytime soon. We therefore affirm the district court's decision to grant summary judgment on plaintiff's claims for injunctive and declaratory relief.

VI.

We do not underestimate the severity of the intrusions plaintiff endured during her incarceration in the Wayne County Jail. The practice of strip searches "instinctively gives us the most pause." *Bell*, 441 U.S. at 558. However, our task is to determine whether the particularized right implicated by defendant's actions was clearly established at the time plaintiff was searched. For the reasons explained above, we hold that it was not. We further conclude that the district court properly granted summary judgment in favor of defendants on plaintiff's cellblock claim and claims for injunctive and declaratory relief.

We therefore affirm the judgment of the district court.

—————————————

## DISSENT

—————————————

CLAY, Circuit Judge, dissenting.  This case turns on whether the officer and the county had a penological justification for strip searching Plaintiff in a group with other inmates.  The entire majority opinion is predicated on the officer's ambiguous and generalized testimony that there was an urgent situation which necessitated the group strip searches.  There is no basis in the record indicating that every time Plaintiff was strip searched in a group, there was a special circumstance at that time.  The majority thus incorrectly holds that Defendant Terri Graham is entitled to qualified immunity and that Plaintiff failed to successfully defend her municipal liability claim in connection with the cellblock search.  The law clearly establishes that the three group strip searches conducted in the Registry of the Wayne County Jail and the strip search conducted in the cellblock violated Plaintiff's constitutional rights.  Plaintiff also persuasively presented her municipal liability claims in connection with the four strip searches.

For the reasons stated below, I respectfully disagree with the majority opinion and would remand for further proceedings consistent with this dissent and direct the district court to consider the viability of Plaintiff's request for class action designation.

## BACKGROUND

Because the majority fails to mention many of the facts reflected by the record and as testified to by Plaintiff, the record needs to be reviewed in order to provide the factual context for the events giving rise to Plaintiff's claims.

On August 2, 2012, Plaintiff was involved in a car accident and three of her close friends were seriously injured.  (R. 44, Defs.' Mot. for Summary Judgment, Page ID # 1455.)  Plaintiff had graduated high school a year prior to the accident and planned to attend college to be a graphic designer.  (R. 44-2, Pl.'s Dep. Tr., Page ID # 1490−91.)  On October 9, 2012, Plaintiff was arrested and charged with reckless driving in connection with the August 2, 2012 accident. (*Id.*)  Immediately following her arrest, Plaintiff was housed as an inmate in the Wayne County

Jail from October 9, 2012, through November 13, 2012. (R. 1, Compl., Page ID # 2.) Prior to her car accident, Plaintiff had never been incarcerated in jail. (R. 44-2 at 1511.)

During her 34-day stay at the county jail, Plaintiff was strip searched at least four separate times. (R. 44-2 at 1499, 1501.) Plaintiff was strip searched three times in the Registry, which is an intake area where the inmates change out of their street clothes into the clothes provided by the jail. (*Id*. at 1499.) Plaintiff testified that when she was strip searched in the Registry, Graham, a female officer, conducted the search and there were at most five other female inmates in the room with her each time. (*Id*.) The Registry room had a wall that was separated by glass. (*Id*. at 1500.) Graham was inside the room with the inmates, and another female officer was on the other side of the glass. (*Id*.)

Although the male officers did not enter the room during these three searches in the Registry, Plaintiff was able to hear male voices coming from behind the glass on the other side of the wall of the Registry. (*Id*.) The voices conveyed to Plaintiff the impression that she was being viewed by the males on the other side of the glass. In questioning Plaintiff about the male voices she heard, Defendants sought to have Plaintiff admit that those voices could have been coming from a room from which Plaintiff would not have been viewed while she was being strip searched. (*Id*.) At the very least, a factual dispute exists as to whether the jail permitted Plaintiff to be viewed by male officers during the three strip searches.

During the searches in the Registry, Graham criticized Plaintiff's body odor and cleanliness. Graham deliberately humiliated Plaintiff by telling her that she smells like a "funky monkey" and that Plaintiff needed to clean herself better. (*Id*.) Graham also handled those female inmates who were menstruating in a way potentially hazardous for their health. Plaintiff witnessed female inmates being strip searched while on their monthly cycle, and described how menstrual fluid was discarded on the floor in the Registry, which nobody attempted to clean up. (*Id*. at 1505, 1512.) Plaintiff further testified that Graham would also light candles and incense due to the alleged smell caused by the female inmates who were strip searched. (*Id*. at 1500.)

In October 2012, the fourth search occurred in the unit where the inmates at the county jail are housed. (*Id*.) These searches of the housing units, or cellblocks, are conducted to search

for contraband. (*Id.* at 1502.)  First, the individual cells are searched. (*Id.*)  Then, once the cells have been searched, the inmates are ordered out of their cells to form a line along the floor in the common area. (*Id.*)  The common area is the area with tables, chairs, and a television in the middle of the floor where the housing units are located. (*Id.*)  Also on this floor is an area called the "bubble" or duty station, where the officers stand in order to view the cells and common area on the floor. (*Id.* at 1502−03.)  There is a tinted glass screen around the bubble through which the officers can see. (*Id.* at 1504.)

During this fourth search, Plaintiff was ordered to stand in line in front of the cells with the other female inmates on her floor. (*Id.* at 1503.)  The women were then told to take off each piece of their clothing, shake the clothing out, lift their breasts, hold out their arms, squat, and cough. (*Id.* at 1502.)  A female officer was involved in supervising this strip search.  Plaintiff testified that there were three male officers, and one female officer, standing in the bubble during the strip search. (*Id.* at 1503.)  Although Plaintiff could not see the male officers' faces because of the tint on the glass screen, she knew they were men because she heard male voices and saw silhouettes of "three buff male officers" standing inside the bubble. (*Id.* at 1504.)  Plaintiff saw the male silhouettes facing in her direction and presumably viewing her and the scene in front of them. (*Id.* at 1505.)

The majority believes that the evidence presented in this case fails to raise a genuine dispute of material fact as to Plaintiff's claims.  I disagree.  The record lacks any indication that Defendants acted lawfully towards Plaintiff and the other female inmates housed at the county jail.  Plaintiff was repeatedly humiliated and embarrassed as a direct result of Defendants' actions in this case.  Although never having been convicted of a crime, at no point during her incarceration was Plaintiff informed of the jail's policies or protocols regarding strip searches and her rights in connection with such searches. (*Id.* at 1504−05.)  Defendants argue that the record is not sufficient to hold them accountable for their actions, and the majority obviously agrees.

For the reasons that follow, I respectfully dissent.

# DISCUSSION

## A. Qualified Immunity

Title 42 U.S.C. § 1983 establishes "a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States." *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 656 (6th Cir. 1994). To succeed on this claim, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). However, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action," "assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted). To determine whether a government official is entitled to qualified immunity, we apply a two-prong test: (1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right; and (2) whether the right violated was clearly established such "that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

In determining whether a constitutional right was clearly established, "[t]he key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional." *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009). "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citation omitted).

5:14-cv-14569-JCO-RSW  Doc # 64  Filed 08/18/16  Pg 26 of 39  Pg ID 1753    (26 of 39)

The Supreme Court has admonished that in most situations, prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). "To ensure that courts afford appropriate deference to prison officials, [the Supreme Court] ha[s] determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987).

The Supreme Court has articulated the following standard: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). A correctional officer's discretionary actions are reviewed under the same deferential standard. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012). Despite the deference given to prison official's actions, the Supreme Court has instructed that "federal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner*, 482 U.S. at 84.

The Supreme Court advises the federal courts that, where a prisoner alleges an unconstitutional search,

> [t]he test of reasonableness under the Fourth Amendment . . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell*, 441 U.S. at 559.

In other words, we first examine "the scope, manner, and location of the search—as well as the justification for initiating it—in order to assess the degree to which it invaded the prisoner's right to privacy." *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013). Next, we "evaluate the need for the search, giving due deference to the correctional officer's exercise of her discretionary functions." *Id.* Lastly, we "determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

First and foremost, the record in this case and our jurisprudence clearly demonstrate that the three strip searches conducted in the Registry violated Plaintiff's constitutional rights. The penological justification given by Graham fails to outweigh the invasion of Plaintiff's privacy rights. Jail personnel must be held to a certain standard of human decency and civility. Although detainees, otherwise known as inmates, enjoy less privacy rights than non-detainees, they still have privacy rights. *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) ("[A] convicted prisoner maintains some reasonable expectations of privacy while in prison . . . even though those privacy rights may be less than those enjoyed by non-prisoners.")

We held that it was clearly established at least since 2007 "that strip searches performed in view of other inmates without a legitimate penological justification violates inmates' clearly established Fourth Amendment rights." *Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 530 (6th Cir. 2016); *see also Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001), and *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir. 1982). We held in *Stoudemire* that although an officer may have a valid reason for searching an inmate, "no special circumstances provided additional justifications for strip searching Stoudemire where others could see her naked." 705 F.3d at 573−74. In *Williams v. City of Cleveland*, we reiterated the ruling in *Stoudemire* that there needs to be "exigent circumstances" compelling the officer to strip search an inmate in view of other inmates. 771 F.3d 945, 955−56 (6th Cir. 2014).

In this case, Graham would have been justified in strip searching Plaintiff one-on-one in order to search her for contraband when she initially entered the jail and when she left and came back from court appearances. However, Graham's justification for strip searching Plaintiff as a part of a group must be akin to an emergency in order to satisfy the Fourth Amendment's prohibition on warrantless searches. *Stoudemire*, 705 F.3d at 574 (finding that "no emergency made such a search necessary . . . . [because] there were no time or resource constraints that supported the need for such a[] [public] search"). Graham's justification for strip searching Plaintiff in a group setting on a number of occasions was not akin to an emergency. Graham justified her actions by claiming that there was an influx of 20 to 25 inmates that needed to be processed before the end of the day, otherwise—according to Graham—those inmates with medical cards would have to wait overnight to be seen by a medical professional. At this early

stage of the litigation, Plaintiff has had little opportunity to verify Graham's self-interested assertions with regard to the justification for the jail's procedures—which in this case would involve reviewing the availability of the jail's personnel and funding resources for the conduct of strip searches.

Graham cannot justify group strip searches such as those to which Plaintiff was subjected merely because there were some female inmates who may or may not have been found to need immediate medical treatment. One of the reasons why this processing of inmates was not akin to an emergency is because this influx of 20 to 25 inmates was not something that happens once in a while. Plaintiff was subject to three group strip searches in the Registry over the course of her brief 34-day stay at the county jail. At a minimum, this non-exigent situation could be anticipated and planned for in advance by the proper allocation of county resources. By the county's own reckoning, this circumstance occurred once every ten days.

The frequency of this occurrence mitigates against characterizing the influx of inmates as "special," "akin to an emergency," or "exigent." It is extremely unlikely that there were special, exigent, or emergency-like circumstances every time the officer publicly and openly strip searched Plaintiff in a group in the Registry. The reason given by the officer was not so much about a special circumstance, but concerned a regular occurrence at the jail. Arguably, the jail is always going to have an influx of inmates needing to be processed. The officer testified that the reason she would strip search the women in groups was because "if we have to search them one at a time, it takes a long time." (R. 44-4, Graham Dep., Page ID # 38 (testifying that the average number of female inmates to be processed each day might be 20 or 25, which therefore suggests that this "influx" of inmates did not occur infrequently but rather all the time).) A possible explanation for the group strip search procedure is that Graham and other jail personnel resorted to the procedure not out of necessity, but because they desired to conduct the strip searches quickly to accommodate their own personal convenience.

The proper course of action Graham should have taken during these alleged "influxes" would have been to process and strip search those inmates with medical cards first, and one at a time, before processing the inmates without medical cards. Graham even testified that the medical cards, or medical flags, are usually given before the strip searches occur. Thus, Graham

would know prior to conducting the strip searches which inmates needed to immediately see a medical professional and which inmates did not.  This proposed system of prioritizing those with medical cards first is one way that would have solved Graham's problem without violating any inmate's constitutional rights.   The majority undiscerningly accepts Graham's justification without considering less intrusive and offensive means by which the female inmates could have been processed.  Such shocking and opprobrious searches of a person's most intimate body parts in front of on-lookers with a blanket explanation that whenever the county jail has to process a lot of female inmates, they can be publicly strip searched in groups, cannot be justified. *Stoudemire* and *Williams* both emphasize that these circumstances need to be "special," or "exigent," and "akin to an emergency."  As discussed above, all three of these circumstances are lacking in this case.

The majority also fails to construe all reasonable inferences from the evidence in the light most favorable to Plaintiff as the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).  The evidence as recited by the majority paints a picture at odds with the actual events that transpired in this case.  The majority fails to mention that the group strip searches were not authorized by any policy the county jail affirmatively approved, nor were the searches carried out in an objective way.  Graham admits in her testimony that the reason she searched inmates in groups of 5 rather than in groups of 6 or 7 was due, in part, to the 5:1 ratio for "transporting" prisoners.  (R. 44-4 at 1538.)  She also admits that there was no policy approving of group strip searches, and that the number 5 is something that she arbitrarily came up with herself.  (*Id.*)  The takeaway from the officer's testimony is simple:  the group strip searches Plaintiff endured were carried out according to the subjective and arbitrary whims of the officer on duty at the time.  This part of Graham's testimony, which the majority conveniently fails to mention, should be reason enough for us to find that the group strip searches endured by Plaintiff were unconstitutional.

Graham also testified that in late 2013, she received a directive which clarified the strip search policy for jail personnel.  The November 2013 directive circulated by the county jail management instructed all jail personnel to strip search female inmates "one inmate at a time in the dress room" by an officer of the same gender and out of view of persons of the opposite

gender. (*See* R. 44-6, Wayne County Divisional Directive, Page ID # 1557.)  The directive also instructed the jail personnel to "be professional at all times." (*Id.*)  The directive fails to specify appropriate circumstances under which jail personnel are permitted to depart from the policies. This directive is especially relevant to our analysis because of what it says and when it was circulated.  In August 2012, a few months prior to the circulation of the directive, a female inmate filed an action against the Wayne County Jail, alleging claims of group strip searches being conducted, similar to Plaintiff's, in a humiliating and derogatory manner, sometimes in the presence of male officers.  The fact that the directive was circulated to all jail personnel, and that it specifically emphasized how jail personnel are not to strip search female inmates in groups, supports Plaintiff's contention that such group strip searches are unconstitutional and contrary to the jail's policy.  The timing of when the directive was circulated also supports the contention that the group strip searches were not only inappropriate and against jail policy, but would not be tolerated by the jail administration.  Whether or not group strip searches were actually against the jail's policy at the time she was strip searched, Plaintiff nevertheless has a viable claim.  This is evidence that the majority omits from its analysis.

Additionally, there is evidence in the record that even the person in charge of managing the intake process at the county jail was unaware, and shocked to discover, that officers were conducting group strip searches of female inmates.  Jeriel Heard, Director of Population Management at the Wayne County Jail, testified that he was not aware that female inmates were openly strip searched in groups.  (R. 44-8, Jeriel Heard Dep., Page ID # 97−98.)  He stated that:

> Officers get caught up in the exigency of dealing with . . . 25 [inmates]. Sometimes we have booked in 40 to 50 females in a day, and we have two female officers there.
>
> So, you know, that is the reason, you know, that you have to reiterate directives and policies because officers will feel under duress or stress and do things that they are – they know they shouldn't be doing.  And, first of all, it's not safe for them to do it.  I mean, I would object because I wouldn't want one officer to be strip searching five inmates at the same time.

(*Id.* at 98.)

Heard's testimony clearly demonstrates that Graham conducted the group strip searches in contravention of the jail's policy and in a manner that put the officer's and inmates' safety at

risk. The officer responsible for processing female inmates into the jail required a more compelling justification for strip searching female inmates in groups other than that it would take less time. There were other, less intrusive solutions to the officer's concern for efficiency that would have been consistent with our jurisprudence on this issue.

Graham provides little evidence demonstrating that every time she strip searched Plaintiff in a group, there was an exigent circumstance *at that time*. The evidence presented by Graham is ambiguous and generalized, and not specific as to what happened on those specific dates. Heard and Graham only testified to the intake process at the jail in general and the estimated number of inmates that would have caused the purported influx. We still do not know, on those days Plaintiff was strip searched, whether the number of inmates that needed to be processed reached 20 to 25. The officer's justification, or lack thereof, is not sufficient to indicate a special, exigent, or emergency circumstance necessitating group strip searches.

Graham further testified that the "ripple effect" of conducting individual strip searches is that "sometimes [the female inmates] get left over to midnight shift," and inmates who cannot get processed in the afternoon shift are processed during the next shift, or midnight shift. (R. 44-4 at 76.) Thus, the amount of time that an inmate would be waiting to get processed could be a difference of hours. There is no indication, nor has any evidence been provided by Graham, that such a delay would have subjected any of the inmates being processed to a health risk.

The issue as the majority frames it is whether our cases clearly establish that a group strip search conducted to expedite access to medical treatment violates the Fourth Amendment. However, that is definitively not the issue in this case. Rather, the true issue is whether the justification provided by Graham sufficiently demonstrates a special, exigent, or emergency circumstance which necessitated that such an invasive and humiliating jail intake process be conducted in the presence of others who had no reason to view such things.[1]

---

[1] With regard to its citation of *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991), the majority makes the baffling claim that Plaintiff seeks to misapply the qualified immunity doctrine by seeking to show that the officer's justification is not clearly established, rather than that Plaintiff's constitutional right, which was violated, was clearly established. Under many factual scenarios, both issues are bound up together when, by way of example, a plaintiff is able to demonstrate that her clearly established constitutional rights were violated but the accused officer attempts to establish a justification that might arguably excuse the violation.

Furthermore, the majority's interpretation of the relevant case law on this issue is completely flawed.  In *Stoudemire*, we considered, along with numerous other factors, the lack of evidence of any time constraints justifying the need for the public strip search.  705 F.3d at 574. This finding, however, does not render *Stoudemire* inapplicable for purposes of our determination in this case.  *Stoudemire* emphasizes a key point, which is that the test for analyzing prison inmate searches is a balancing test, and "not capable of . . . mechanical application" as suggested by the majority opinion.  *Bell*, 441 U.S. at 559.  The lack of time constraints in *Stoudemire* does not make it irrelevant for our purposes.  The point is that it does not appear that the officer in this case was under any emergency-like time constraints during any of the particular searches in the Registry; certainly, the record below fails to indicate any such time constraints.  Thus, like *Stoudemire*, this factor weighs in favor of Plaintiff.

*Stoudemire* also supports Plaintiff's argument given the scant documentation of the alleged "exigent circumstance" offered by Graham.  The exigent circumstance, as argued by the officer, is that the inmates needed to be speedily strip searched so that they could be provided medical treatment as soon as possible.  Despite Graham's assertion, she has not provided sufficient evidence as to why there was such an "exigent circumstance" at the time the group strip searches were performed on Plaintiff.  It is clear from Graham's and Heard's testimony that the group strip searches in the Registry were not conducted in accordance with the jail's policy, and that they were likely conducted in accordance with Graham's personal preferences or to suit her personal convenience.  Additionally, Graham is not clear as to the specifics surrounding the three Registry group strip searches.  In *Stoudemire*, the search and the specifics surrounding that particular search were clearly documented by sufficient evidence in the record.  It was clear in *Stoudemire* that the jail personnel had no special time constraints or other justifications for conducting the strip search in view of the other inmates.  Conversely, the record in this case is bereft of the details surrounding the three Registry group strip searches.  In *Bell*, the Supreme Court explicitly stated that the courts are tasked with the responsibility to determine "the need for the *particular* search" at issue.  441 U.S. at 559 (emphasis added).  We are unable to do that in this case with the deficient record presented to us on appeal.

Despite the majority's claim, *Williams* also offers guidance for our determination.  In *Williams*, we held that the plaintiffs' claims involving group strip searches should survive the defendant's motion to dismiss.  Although *Williams* did not involve a motion for summary judgment, we nevertheless asserted propositions of law regarding the justification the defendant provided at the time.  We stated in *Williams* that "[g]iven the significant incursion into plaintiffs' privacy rights caused by the jail's preferred method of searching and delousing [plaintiffs], the jail's need to perform the searches in this particular manner must be unusually dire before it can outbalance the affront to plaintiffs' privacy."  771 F.3d at 954.  In response to the defendant's purported justification for delousing the plaintiffs' genitals with a spraying agent, we stated that "there is no question that permitting self-application of the delousing solution would be less humiliating and invasive than the 'hose treatment.'"  *Id.* at 955.  Similar to *Williams*, there is no question that prioritizing the inmates in need of medical care with medical cards ahead of the other inmates would have solved Graham's alleged timing problem, and more importantly, would have been significantly less intrusive and embarrassing than the group strip searches.

Likewise, our decision in *Dufrin v. Spreen* supports Plaintiff's proposition that Graham conducted unconstitutional strip searches and that Graham was on notice when she conducted the searches that such group strip searches were unconstitutional.  712 F.2d 1084, 1089 (6th Cir. 1983).  In *Dufrin*, we held that the strip search of an inmate was not unconstitutionally invasive because "the search actually conducted was visual only, and was carried out discreetly and in privacy."  712 F.2d at 1089.  Specifically, we concluded that the strip search in *Dufrin* was not unconstitutionally invasive because it was visual only, conducted by a female attendant, "was conducted in the privacy of a room in which only the jail matron could observe the prisoner. . . . [and] [t]here [wa]s no claim of offensive behavior on the part of the matron or of anyone else in connection with the search, beyond that inherent in the nature of the inspection itself."  *Id.* at 1087.

The strip search at issue in *Dufrin* was a proper example of a constitutional strip search because the inmate was searched in private, without onlookers, and was conducted without the officer making offensive and harassing comments.  Graham did not conduct the search in the manner outlined by our decision in *Dufrin* even though she was on notice that such outrageous

and offensive conduct would not be tolerated.  Graham strip searched Plaintiff in view of numerous other female inmates and made offensive and harassing comments about Plaintiff's alleged smell and lack of cleanliness, and used the derogative term "funky monkey" to describe Plaintiff.  Although Graham's offensive and insulting remarks do not render the strip search per se unconstitutional, *see Roden v. Sowders*, 84 F. App'x 611, 613 (6th Cir. 2003) ("Even if [the prison officer] did laugh, the strip search is not rendered constitutionally invalid thereby[,]"), the comments may, in context, suggest personal animus and implicate the dignitary interest 'inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches,'" *Stoudemire*, 705 F.3d at 573 (quoting *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 499 (6th Cir. 2008)).

Because the three Registry group strip searches violated Plaintiff's clearly established Fourth Amendment rights, I would hold that Graham is not entitled to qualified immunity.

Furthermore, Plaintiff's claim that Defendants violated her constitutional rights by forcibly exposing her to male officers while she was being strip searched in the cellblock should have survived summary judgment.  At the very least, a factual dispute exists as to whether the jail permitted Plaintiff to be viewed by male officers during the cellblock search.  Plaintiff presented evidence, which Defendants failed to rebut, that demonstrated at least three male officers viewed her while she was being strip searched in the cellblock.

Our precedent clearly establishes that an inmate has a valid Fourth Amendment privacy claim when he or she alleges that members of the opposite sex viewed them during a strip search without a penological justification.  *See Cornwell*, 963 F.2d at 916.  Plaintiff noted in her response to the motion for summary judgment that "Defendants are not seeking summary judgment as to Plaintiff's claims that her strip search, in the presence of members of opposite sex, was a violation of her Fourth Amendment rights."  (R. 49 at 1614 n.1.)  The majority briefly addressed this claim and held that Plaintiff was mistaken to have thought Defendants were not challenging this claim.  The majority misinterprets the record.  With regard to Plaintiff's individual constitutional claims, Defendants only challenged Plaintiff's claim in connection with the three group strip searches in the Registry.  (*See* R. 44 at 1451 (listing the statement of the issues and only challenging one of Plaintiff's individual constitutional claims—the group strip

search claim in the Registry).)  Thus, Plaintiff was correct in stating that Defendants did not challenge this claim in their summary judgment motion.

The majority also contends that Plaintiff has no individual claim regarding the cellblock search because she failed to sue an officer other than Graham in their individual capacity for partaking in this search.  The majority fails to view this claim in its proper context.  Plaintiff was incapable of recalling the names of the male officers that viewed her that day because their identities were concealed behind the tinted glass in the bubble.  Not unless every male officer who worked that day was deposed and the officers who viewed her admitted to such conduct would Plaintiff have been able to name the officers individually in her complaint.  Additionally, Plaintiff was not given the opportunity to amend her complaint to address this issue.  Discovery on this issue was thus insufficient.  It would therefore be beneficial to remand the case in order to give Plaintiff an opportunity to conduct more discovery so she can identify the individual officers, both male and female, who were involved in the cellblock search.  In this regard, the district court should be instructed on remand to permit the parties to address the issue of whether discovery should be reopened for purposes of identifying both the female officers who conducted the cellblock strip search and allowed the male officers to view the female inmates, as well as the male officers who viewed the cellblock search.

Because the cellblock group strip search violated Plaintiff's clearly established Fourth Amendment rights and because Graham failed to challenge this claim on summary judgment, I would hold that Graham is not entitled to qualified immunity.  I would instruct the district court on remand to allow Plaintiff an opportunity to amend the complaint to permit further discovery to be conducted on this claim.

### B.  Municipal Liability

Also problematic is the majority's holding that Plaintiff's municipal liability claim fails because she failed to incorporate the other inmates' affidavits in connection with her cellblock strip search claim.  The district court granted summary judgment in favor of the county on Plaintiff's municipal liability claim because it determined that Plaintiff could not demonstrate that the county's policy was responsible for male officers viewing her unclothed and other

female inmates being strip searched in the cellblock.  (R. 58, District Court Op'n, Page ID # 1715−16.)  The district court specifically held that because Plaintiff alleged only one instance in the cellblock where male officers allegedly viewed her while she was being strip searched, her municipal liability claim must fail.  (*Id.*)  The majority agrees with the district court's rationale and further adds that Plaintiff failed to mention the cellblock municipal liability claim at all in her response to the motion for summary judgment.  The majority insists that Plaintiff only mentioned her municipal liability claim as it relates to the group strip searches in the Registry, not the cellblock, and that this mention was brief and failed to include the other inmates' affidavits.

The majority has again improperly framed the issue.  Plaintiff properly defended her municipal liability claim as it relates to the cellblock search.  Plaintiff argued in her response to the motion for summary judgment that "[t]he manner in which Graham conducted these strip searches compels the denial of her claim to qualified immunity, and also supports Plaintiff's *Monell* claims against Wayne County."  (R. 49, Pl.'s Resp. to Mot. for Summ. J., Page ID # 1621.)  Plaintiff's pluralization of "claims" in her response signifies that she was referring to both of her *Monell* claims as alleged in her complaint:  (1) the group strip searches in the Registry; and (2) the cellblock search.  The majority failed to acknowledge that Plaintiff alleged numerous grounds for the county's *Monell* liability in her complaint, including her cellblock search where male officers inappropriately viewed her.

Even if Plaintiff's cellblock *Monell* claim could have been more extensively argued in her response to the motion for summary judgment, Plaintiff was certain that male officers were in the bubble viewing her and the other female inmates being strip searched, and alleged as much.  There is no evidence in the record that forecloses the possibility that male officers were actually in the bubble.  The district court erroneously held that, "[e]ven if plaintiff was searched in the manner alleged in her deposition testimony, a single instance of male deputies being in the duty station during the search is insufficient to establish that Wayne County had a policy or custom of exposing female inmates in a state of undress to male [officers]."  (R. 58 at 1715−16.)  The majority agreed with the district court.

The majority further added that the district court did not err in deciding not to consider identical allegations in the affidavits from other female inmates because Plaintiff did not bring them to the court's attention in connection with the cellblock claim.  The majority is wrong.  In Plaintiff's response to the motion for summary judgment, she expressly stated that she "filed with the Court hundreds of affidavits of inmates testifying as to the unreasonable manner of their strip searches, either in the registry room, or in the presence of men, or both" and that she "relies on, and incorporates herein, the affidavits filed at Docket 30-1 in opposition to summary judgment."  (R. 49 at 1618, n.2.)  In this same response, Plaintiff directs the district court's attention to specific affidavits in the record that recount occasions when male officers were present during their strip searches.  (R. 49 at 1620−21.)  The affidavits from the other female inmates depict countless occasions where they were forcibly exposed to male officers during strip searches.  (*See* R. 30-1, Affidavits from Similarly Situated Female Inmates.)  The district court erred by granting summary judgment in the county's favor on this claim because Plaintiff expressly directed the district court's attention to specific affidavits in the record that corroborated Plaintiff's *Monell* claim that the jail had a policy or custom in practice of forcibly exposing female inmates to male officers during strip searches.

Likewise, Plaintiff's *Monell* claim as it relates to the group strip searches in the Registry was sufficiently defended in her response to the summary judgment motion.  Plaintiff noted in her response that the hundreds of affidavits of female inmates detailing "the unreasonable manner of their strip searches . . . in the registry room" support her opposition to the summary judgment motion.  (R. 49 at 1618, n.2 (citing to the hundreds of affidavits which detail countless instances of group strip searches).)  Thus, Plaintiff properly put forth evidence creating a genuine dispute of a material fact as it relates to her municipal liability claim in connection with the group strip searches in the Registry.  This genuine dispute thus forecloses summary judgment in the county's favor.  Even without considering the affidavits of the other female inmates, Plaintiff alone alleged three different instances where she was strip searched in a group.

Thus, I argue that Plaintiff can demonstrate not only an individual constitutional violation as to the group strip searches conducted in the Registry and the strip search conducted in the cellblock, but also a genuine dispute of a material fact in connection with the county's custom or

practice of allowing these group strip searches to occur and forcibly exposing female inmates to male officers during strip searches.

## CONCLUSION

As articulated above, the analyses utilized by the majority in connection with its qualified immunity and municipal liability discussions are plainly wrong.  Specifically, I disagree with the majority's holding as it pertains to the finding of qualified immunity for Graham and the finding that Plaintiff failed to raise municipal liability claims against Wayne County.  Accordingly, I respectfully dissent and would remand for further proceedings and direct the district court to consider the viability of Plaintiff's request for class action designation.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 16-2102

AMANDA SUMPTER,
     Plaintiff - Appellant,

    v.

WAYNE COUNTY, et al.,
     Defendants - Appellees.

> **FILED**
> Aug 18, 2017
> DEBORAH S. HUNT, Clerk

Before:  CLAY, SUTTON, and GRIFFIN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk